Our next case this morning is Cranberry Growers Cooperative v. Patrick Layng, trustee. Or in Ray Cranberry Growers Cooperative. Ms. Sakata. Good morning, Your Honor. May it please the Court, Ms. Sakata for appellant, the United States trustee. Your Honor, section 1930 of title 28 provides a comprehensive scheme governing what fees have to be paid in bankruptcy cases. And it sets forth both obligations and protections. On the one hand, Chapter 11 debtors have to pay quarterly fees based on the disbursements made in its case. But on the other hand, there is a maximum statutory cap. So debtors will never have to pay above a particular amount in their case, whether as a percentage fee or as a set monetary amount. And these fees are important. Congress cares about them. Among other things, in the bankruptcy code, if the debtor doesn't pay their fees, their Chapter 11 case can be dismissed or converted to Chapter 7. And if their reorganization plan doesn't provide for the payment of these fees, the debtor can't reorganize. Now, Congress made a legislative determination when it chose disbursements as the mechanism by which to calculate fees. And this appeal is about what disbursements mean. We submit that the common understanding of the term refers to monies paid or expended. So disbursements is a simple but broad term that captures a wide variety of payments that could be made in a debtor's case. The Bankruptcy Court below committed reversible error by inserting limitations and exceptions to the term where it didn't exist. The court added an additional requirement that to be a disbursement, a payment must have, as a matter of substance, result in what the court deemed to be an actual settlement of debt. Now, these requires don't have a statutory basis in the language. But in addition, even under the Bankruptcy Court standard, the payments at issue here qualify as disbursements because they did result in an actual settlement of debt. Now, there is a lot of... As I understand these roll-up, the transactions in question converted pre-petition debt to post-petition debt. That's correct, Your Honor. It was a conversion, but through payment. There was no other way for this debt that Kranger owed to Cobank before it filed for bankruptcy for that suddenly to become a loan it owed post-petition unless it paid back the old debt. It was only through payment of the old debt and taking on of new debt that the Cobank was allowed to improve its position vis-à-vis other creditors in the bankruptcy. Right. Is the complication here that we have the same lender, pre-petition and post-petition, essentially repaying itself through contractually approved and court-approved disbursements in the sense of receipt of receivables? Your Honor, we wouldn't think that it complicates the matter. It would be no different if there had been a different post-petition lender, if the pre-petition debt were paid with the proceeds of a different post-petition lender. Either way, these are going to be payments simply because pre-petition debt is different. They have different legal rights and obligations with regard to it than post-petition debt does. And there's different priorities if it's post-petition? In terms of post-petition debt, there are allowances under the Code to grant a post-petition loan greater protections, and that is what happened here. They were granted higher priority than other administrative expenses that pre-petition debt would not have been given. Right. That's the whole reason for this technique, right? That's correct, Your Honor, but it really doesn't change the fact that in order for that conversion to occur, the pre-petition debt had to be paid, and that is a disbursement. There is nothing inherent within the Code that would render the payment of that pre-petition debt for the purpose of allowing the lender greater protections any less of a money's expended under the sort of plain language of the statute. Because money is flowing out of the bankruptcy estate. Correct. The debtor's estate, and flowing back in instantaneously based on the operation of this cash flow device. Well, I mean, so that goes to a different feature of what happened below, Your Honor. There was a revolving line of credit, and that was a way for Crangrow to both pay back its debts to Cobank and also to take on new debt. And so they would borrow and then repay and then re-borrow on the same line. But every time it repaid, it was repaying a specific old debt that it already owed to Cobank, and that was taken off the books. And so regardless if it was being permitted to take on new debt, there was still a disbursement under the line. And I think the bankruptcy court was trying to distinguish these payments, Crangrow's payments, from other payments that were deemed to be disbursements in other cases by other courts by focusing on how these payments were distinct. And so it did focus on the fact that it was being done on a revolving line of credit and the fact that it was being done as part of a roll-up payment. But neither feature, by itself or in combination, rendered these any less disbursements. I mean, the fact that the overall debt on the revolving line of credit didn't change doesn't have really any significance for purposes of the term disbursement. Congress considered and rejected the idea of assessing quarterly fees on a debtor's liabilities, which would have included their debts. Instead, it focused on cash flow, on whether or not money was changing hands. And it was changing hands here because Crangrow was directing its customers to send their accounts receivables to Cobank. Cobank was taking that money, that was a disbursement, and applying it to the debts that Crangrow owed it. And regardless of whether it was advancing new money on the same line, at that point at which it was taking the accounts receivables and applying it to existing debt, that was a disbursement. My understanding of the bankruptcy court's concern was that in addition to general concerns about fairness to mid-level Chapter 11 debtors, she was concerned that these outlays were being counted twice for purposes of measuring disbursements and the quarterly fees. Is that, in fact, what's going on? No, Your Honor. What was happening was Crangrow had operating expenses that it had to pay. It borrowed money to do so. It borrowed money from Cobank and then took the loan proceeds and paid its operating expenses. Now, separately, as another expense, it had to repay back those loans. And so it was repaying loans to Cobank and then getting additional funds to pay its operating expenses. That was part of the full financial picture that was going on. Including the next quarter disbursements or the disbursements to the bank that were being counted as toward the fee assessment? Yes, Your Honor. I mean, that's where the double counting comes in? Well, it's a very small percentage of what was, if this were to be considered double counting, our position is it's simply applying the letter of law to see what money is being expended. It's just a consequence of this post-petition financing device, essentially. Well, not necessarily, Your Honor. I mean, if you were going to say that quarterly fees shouldn't be being expended on monies that you're using to pay your quarterly fees, that doesn't have to be done in the context of post-petition loan or roll-up financing arrangement. But if you're going to consider whether or not you should be calculating fees based on money you borrowed to pay your quarterly fees, that would be a very small percentage of what the court discounted from the fees as being the basis for calculating fees. And so I think to the extent there was some concern about that portion of double counting, the relief granted was far greater than was warranted. Well, it's not insignificant if the Chapter 11 debtor is maxing out on the fees every quarter, right? That's a lot of money. It's 1% of its disbursements, Your Honor. And it was assessed on debtors who had over a million dollars per quarter in disbursements. But the $250,000 fee, I'm sorry, is it $200,000 or $250,000? It's $250,000 statutory max or 1%, whichever is lesser. And so the debtor here had, you know, it's not maxing out at $250,000. It was only 1% of its disbursements. And so it was certainly an increase from previous years. But as we showed in the chart on page 13 of the reply brief, previous years it had been a very small percentage of debtors' disbursements. And the fact is, you know, it's within Congress's purview to determine what and how it's going to pay for the bankruptcy system. And Congress made a legislative determination that it did not want to burden the public fisc with the costs of running the U.S. trustee program as part of the bankruptcy system. And it made a determination that if it did not increase these fees, the impact would be borne by the general taxpayer and it wanted to avoid that. Now courts may disagree with that policy decision, but it's not up to courts to undermine, if I can guess, the legislative determination once it's made. Courts cannot use their equitable powers to circumvent requirements set in the statute. And it doesn't really make sense for courts to be revisiting the interpretation of a term and a statute that had been around for 30 years because of an increase in fees that occurred one year ago. Now the courts have consistently interpreted the term disbursements broadly to capture the wide variety of payments. If Congress disagreed with that interpretation, it had opportunities to do so. It's amended the statute in various ways numerous times. In fact, has done so in response to court opinions it disagreed with. One example cited in Crangrove's brief on page 18. And yet at no point, despite the numerous court opinions that have interpreted the term disbursements broadly, has Congress ever attempted to limit sort of the scope of disbursements. What's the amount of the outstanding debt? I have to admit, this case confuses me a lot. Whatever it took to, they put a whole lot of money up front, as I recall. Is that right? Building things? Yes, Your Honor, that's right. Several million dollars, as I recall. I believe so, yes. They created a facility and there were cost overruns. Yeah. I don't know how that's being parceled out. Then the other question is on cranberries. The market for cranberries. Did I read here that the market for cranberries is low? I think I read it somewhere here. I believe that was part of the Bankruptcy Court's opinion, Your Honor. But again, I have to say that those were going to be equitable considerations as to whether or not it would be fair. Something's going to be discharged. I have to say I got pretty confused about this case and about the forward payments and all these other things. Go ahead. I don't want to interrupt you more because the more I hear, the better. I'm happy to hear that, Your Honor. I'm sorry that the briefing was confusing. I think that the essence of it, the essence of the mechanism that Congress chose, was intended to be straightforward and simple. When did money change hands? And at the time that money changed hands, there's a disbursement, and that has to be used as the mechanism for calculating fees. Well, money changes hands when you sell the cranberries, and then what do you do with the proceeds? Well, you take the proceeds, and in this case, what Cranberry did was it paid back the loans it owed to its creditor, its bank, and then it borrowed more money, and then it paid its employees and its utilities and other operating expenses it had to run its business. And both of those, the repayment of its loans and the payment of its operating expenses, are disbursements for purposes of the statute. I guess I just want to know if they're selling enough cranberries for this thing to even keep going. There's nothing in the record, Your Honor, to indicate that it's not. They confirmed their plan. They have reorganized. They were certainly able to afford paying not enough against their very professional counsel, but they were able to pay a cumulative million dollars in legal fees in the course of the case. There are fees associated with having to be in bankruptcy, and this just happens to be one of them. There's an externality to engaging in transactions if you are a debtor in the bankruptcy system. And we understand that the fee increase was large, but Congress determined they were necessary to be able to carry the burden of allowing debtors to seek bankruptcy relief. And no equitable exceptions? Your Honor, not where the requirement is set out by statute. If the court has any more questions, I'll reserve the remainder of my time. Mr. Mertz. May it please the court, my name is Justin Mertz. I'm counsel for Cranberry Growers Co-op. Cran Grow is a Wisconsin co-op of Cranberry Farmers in the middle of the state of Wisconsin in Warrens. My firm was involved with getting Cran Grow through its Chapter 11 proceedings in the Western District of Wisconsin, which did in fact conclude at the end of 2018. I'd sort of like to refocus the court at the onset of my portion of the argument. What Attorney Sakata talked about was everything having to do with the revolver and how the revolver works, and we can talk about that. But I'd like to focus first on what Cran Grow believes is the most important argument for this panel on appeal, and that is the unconstitutional application of the new statute. That's not a good place to start. Okay, Your Honor. That wasn't briefed or argued below. The judge didn't rule on it. She stuck it into her certification opinion as an add-on, which is not appropriate. I understand, Your Honor. I guess with that said, let me address that second, Your Honor. But I don't think that a waiver argument applies to Cran Grow given the facts of how that law was incorporated to debtors across the country by way of a judicial conference policy or by way of a judicial conference a year after the law went into effect. But I'd like to hit that because I think it's really important. And that's why I want to address it first because I think it's so clearly unconstitutional in its ununiform application that I'd like to discuss. That's an argument for going back to the bankruptcy court prior to the certification and asking for an opportunity to brief it rather than bootstrapping it into the appeal by way of the certification order. That's not what Cran Grow was trying to do. Cran Grow was unaware of that unconstitutional application. Tell us whether you had an adequate opportunity to do that. Right. So let me address that. Let me address that. And a question about what kind of a procedural device was available to you in the bankruptcy court to do that. Thanks, Your Honor. It's really a timing issue. The new fee statute went into effect in 2017. The effective date of it was as of January 1st of 2018. That's when the new quarterly fee was assessed against Cran Grow. We looked at the retroactive application of that law at the onset and figured it was a taxation statute. Tax statutes are typically retroactively applied against companies. We didn't raise that argument. We didn't raise that constitutional argument when we fought about this revolver payment issue. Cran Grow objected in June 1st of 2018. The problem is, and the court resolved that issue in August 28th of 2018. The law did not uniformly apply to all debtors in all federal districts until after the bankruptcy court heard oral argument on the revolver issue. And let me explain. The reason why is because the United States Trustees Program is not a national program. It does not exist in two states, in North Carolina and Alabama. And because of that, when the law originally went into effect, it didn't apply in those two states. But you knew that, didn't you? We didn't know that. Why? Well, for two reasons. First, this was addressed previously in the Victoria Farms case out of the Ninth Circuit. In the early 90s, Victoria Farms looked at this, said, there's an unconstitutional misapplication of the law because there is no U.S. Trustee Program in those two states. So what Congress did was instead of push those two states into the U.S. Trustee Program, it instead applied a new subsection, A-7, to 1930. A-7 is really why this thing exists and why there's this lag in the constitutional application. A-7 simply says it directs the attention over to the judicial conference and it allows the judiciary branch to apply the quarterly fee statute against the two bankruptcy administrator states of North Carolina and Alabama because those are under the judiciary branch. But what happened here is the judicial conference didn't actually meet until a year after the new statute went into effect. Now, here's, I think, the most important point of why Crangrove couldn't have known about this. There's really two issues. One, A-7 seemed to fix the problem. It seemed to kick the issue over to the judiciary branch to apply this law against all debtors, including the ones in the bankruptcy administrator district. Although the judicial conference hadn't acted. It hadn't acted yet, and it hadn't acted until after we fully briefed and argued this case in front of the trial court. But the real issue is when the judicial conference implemented this law, it did not do so on a retroactive basis. So you knew there was a problem, or you could have known as a lawyer. It's possible we could have known that there was a problem. But you didn't know that when the judicial conference eventually acted, they hadn't acted yet, that they wouldn't do it retroactively. That's absolutely right, Your Honor. So you were really betting, if you want. I'm trying to put myself in the position of you and your colleagues sitting around the conference table in your law firm, deciding what you're going to do with this thing. You certainly were on notice that there was an uneven application of the bankruptcy law. I mean, you knew the two Dixiecrat states were out of this deal, all right? That's right. You knew that. You knew that the Congress had said they knew about it, and had tossed it over to the judicial conference to do something about it. That's correct. And you were relying on the fact that the judicial conference, when they did act, they hadn't yet. When they fixed the problem, they'd do it retroactively and clean up the mess, right? Well, that's exactly how the statute applies to debtors like Crangrove. So, yes. And the problem is they didn't clean up the mess. They didn't make the thing retroactive, the judicial conference, right? That's right. Now, time-wise, when did they do that with respect to where you were in the district court? What I'm trying to find out is whether you had enough time to figure out that the judicial conference, contrary to your presumption, was going to leave this mess behind. So, the judicial conference met on September 13th of 2018, nearly a year after the law went into effect originally. Right. The bankruptcy court's opinion was issued a week later. So, this had already been fully briefed and argued, and we were sitting there waiting for the court's opinion. It came down a week after the conference. So, you had some time there where you could have gone to the bankruptcy court and said, Hey, wait a minute. The district, we got a problem. The judicial conference didn't clean up the mess, right? In theory, I think that's true, Your Honor. Tell me why that's only in theory and not in practice. That's frankly what I've been worried about in this case. I think the issue there is the general public has no way of knowing what happens at the judicial conference until the meeting minutes are posted. I don't know when that occurred. It occurred sometime after September 13th of 2018. And then once the judicial conference implemented that policy saying, Okay, bankruptcy administrators, go implement this new rule in the two states that are not part of the program, that didn't get implemented until October 1st of 2018. How was that implemented? What kind of a device is there? So, there are notices that were issued by the bankruptcy administrator in those six federal districts in those two states. But not to the general bench and bar of the nation. Was there anything to the general bench and bar of the nation to say? Not to my knowledge, Your Honor. Oh, okay. So, the conference corrected the non-uniformity in September of last year. But the state of non-uniformity existed before that and you were aware of it because the Ninth Circuit opinion has been on the books for two decades. We weren't aware of it because our presumption is that drafting subsection A-7 had fixed the problem. So, the question that we have to decide is whether that reliance, that presumption that you made that the judicial conference would clean this up retroactively was a reasonable decision to make at that particular point in this litigation. Am I right? Well, not necessarily. And let me tell you why. That's what I need to know. When the law was actually implemented by the bankruptcy administrators on October 1st of 2018, it did not retroactively apply the law. That's when we started talking about this. It only applied that law on a prospective basis to all of those debtors. And you were presuming the opposite. It could have certainly been the opposite. And if it were, we wouldn't be arguing about the non-uniformity problem in this appeal. Right. But this is the proper venue to raise that because we couldn't have done it before. You could have done it before. You don't have to rely on the judicial conference to correct the non-uniformity, even though the conference has the authority to do so. You just gambled that it would. And it didn't for the operative period here. That's the problem. So, you had all those intervening months. And, in fact, when you originally challenged this, you could have raised the non-uniformity problem. Well, we did raise a non-uniformity issue in our original objection, Your Honor. But it was dialed in in scope to the revolver issue because that's the only thing that we were fighting about. But you didn't press the non-uniformity issue with respect to these two outlier states, which is the argument you're raising now. I think that's true. But we didn't know that A7 hadn't already applied this new law to the revised A6. That requires an action from the conference, does it not? Apparently it does. But based on the way that A7 is drafted, reading subsection A7, it's not readily apparent that the judicial conference has to go back and revote this new scheme of taxing debtors every time there's some type of change in A6. But regardless of that, the problem that we face today is that the law was, in fact, applied differently in those two states because it only is applied on a prospective basis. That's not the way the law applies to Crangrove or any other debtor that was in the system prior to October 1, 2018. So, in other words, these things usually do apply retroactively when there's a change in the law, is that right? Well, I think these things usually apply uniformly where the judicial conference could have said, we're going to apply this to every other debtor in these two districts the same way. I'm tracking you now. You thought that they would clean up the act because of the constitutional provision, right? They could have. The judicial conference, when it does this, is going to do it retroactively because the Constitution requires it. I think that's right. And I think the judicial conference was aware of this non-uniformity problem. It was discussed in some of the meeting minutes. But they took it upon themselves because there was also discussion about, well, maybe it's not fair that this law is retroactively applied. We should give some type of notice. So let's give them two weeks. The bankruptcy administrators put them on notice two weeks later on October 1, and we're only going to apply it on a forward-looking basis. So you were acting on the presumption that the judicial conference would act constitutionally from your perspective and not unconstitutionally. I think that's right. And they acted unconstitutionally. The way that it's been implemented is unconstitutional because for any case that was filed prior to October 1, there is not consistent application of the law across all states. And if you go look at the notices, which are in our supplemental appendix at pages 63 to 72, the language used by those bankruptcy administrators in the notices that went out says exactly what the conference implemented at the convention. It only applies it on a prospective basis. So somebody who was already in the system in September of 2018 is paying the additional fees, but somebody who filed a couple days later is not paying those fees, even in those districts. That is the problem with how the law was implemented across the nation. And the Ninth Circuit found a constitutional violation based on that structure of the system? Well, the basis for their finding on unconstitutionality was a non-uniform application with respect to those two states. And everybody is just ignoring that decision. Well, they're not ignoring it. I think everybody assumed that it was fixed because A7 was implemented by Congress as a result of the Victoria Farms case. So what it does is instead of fixing the underlying problem of implementing that, of really forcing those two states into the U.S. trustee program, then we wouldn't have a problem. Instead, it said, okay, because North Carolina and Alabama really don't want to be on the U.S. trustees program, let's let the judiciary branch take care of it, and they can implement those fees. And if the judges in those districts would rather work that way and implement it through the judicial conference, sure, that fixes the problem. And it did fix the problem for almost two decades, until now. I'm sorry I didn't get to the revolver question. It is a very technical question, but let me sum up my main position real quick, if I may. The key takeaway from the bankruptcy court's opinion is that the rule in this circuit should be substance over form. What the U.S. trustee is attempting to do with respect to the revolver payment issue is double tax a debtor with a revolving line of credit. It is taxing money when it first comes in the door for Crangrove's use, and it taxes that money when the money leaves Crangrove in the form of what a customary, normal operating expense might be. How is the fee assessed against money coming in the door? It only applies to disbursements from the estate, not... Well, Crangrove can never use the funds unless they're cycled through that revolver. That is the structure of that revolving line of credit. It's set up that way simply to shift the pre-petition debt to post-petition super-priority debt. Right, but how is there a double assessment on the same disbursement? So let's take a look at $100,000 payment for cranberries. That payment from a customer goes directly to the bank. Crangrove can't use it. That money is recycled through that revolving line of credit. It's spit out a day or two later to Crangrove for its use. Crangrove now has the funds finally. There's already been a tax, according to the U.S. Trustee's assessment of the word disbursement. But now that Crangrove finally has the money, it uses that $100,000 to pay wages and expenses and taxes and whatever. When that money goes out the door, in the traditional sense of the term, it is taxed again. In a different disbursement. Well, it's the same dollars, but it's a different disbursement. But I think the distinction is that disbursement is a tax on the debtor's use of the funds. It's using those funds and consuming them to buy products or pay for something. Is one disbursement a continuing process? The revolving line of credit is a continuing process, Your Honor. Money comes in and it is automatically recycled through the revolver and spit out to Crangrove for its use during the normal course of business. But it's not, as a book matter, a fees assessment on the same disbursement. There are different disbursements. There are two separate transactions. That's right. All right. Thank you. Thank you. Ms. Zaccata, was her time up? You've got a minute left. Thank you, Your Honor. I have just a quick note to discuss whether or not the potential constitutional arguments that Crangrove's only now raised, were they knowable before the bankruptcy court issued its opinion? And I believe the fact is they could have. The fees that were being assessed in the bankruptcy administrative jurisdictions were publicly available information. And Crangrove itself cites various of these websites in its supplemental appendix from pages 63 to 72. Those are notices of a change. But the websites themselves were in existence telling debtors how much they had to pay. So the differential was publicly available information that was knowledgeable. So the question is whether or not they were reasonable, your opponents were reasonable, in presuming that this problem was going to go away because the Judicial Conference of the United States would make the fees retroactive. It would make them retroactive to avoid the unconstitutional situation of having uneven bankruptcy regulation throughout the United States. I mean, they presumed that a governmental body would act constitutionally. That's what they did. Your Honor, I can't presume to know what was in their minds. Well, I mean, the question is whether that's an objectively reasonable thing for a lawyer to do. I think if you are representing your client's interests and there is a reasonable argument you can make to object to fees that you're already objecting to, then as a lawyer you should probably be making them. But separately, I would urge this Court not to consider these newly raised issues that are being brought up for the first time on appeal. They were not raised below. Any uniformity arguments they were making was solely towards the statutory interpretation questions. I mean, if the man acted reasonably, then shouldn't we remand the whole thing to bankruptcy court and let her address it? Your Honor, we believe that these arguments were forfeited. And the issue is really only before this Court of what issues were raised below and were resolved by the bankruptcy court opinion, which deals solely with the issue of statutory interpretation. So now we're going to be in a situation where the Judicial Conference of the United States punts and acts presumptively unconstitutionally and now a court of the United States says, by the way, we're not going to look at the issue. Your Honor, so we're not running away from this argument. We take this argument very seriously. No, in the Texas bankruptcy case that Crandall relies on, the government has appealed. And in fact, the Office of Solicitor General has authorized the government to petition for direct review from the Fifth Circuit. We're currently waiting for certification, but we have every reason to believe and anticipate. Then we should hold this case, should we not? I'm sorry, can you repeat that? Shouldn't we hold this case then? That is within this Court's discretion. I would posit that the issues, particularly where the argument could invalidate a federal statute, it would be best for it to be considered on appeal in a case where they were squarely raised and resolved by the trial program. And apply it to these people unconstitutionally. What position is the United States trustee taking in the Fifth Circuit case? We believe that the bankruptcy court, that it was wrong, basically. We believe that it was entirely within the constitutional authority of Congress to enact the 2017 amendment. If this Court decides to reach this issue, we are ready to submit supplemental briefing, putting a full explanation as to why this is the case. What is the position of the United States trustee on the question of there being uneven fees in the two Dixiecrat states and in the rest of the United States of America? Is it constitutional or not? What is the position of the United States trustee in this case going to the Supreme Court? It's the position of the United States trustee and the government that the 2017 amendment increasing the fees is constitutional. And we are prepared, if this Court wishes, to submit supplemental briefing on this issue. The amendment to increasing the fees in the rest of the United States? That is what is being challenged by Kranger here, is the increase. And so our position is that the constitutional amendment is, sorry, I beg your pardon, the 2017 amendment is constitutional and within the authority of Congress to issue. And we can, if this Court desires to reach out unnecessarily to resolve this issue that was never raised or resolve below, we can provide supplemental briefing on this issue. In other words, you're taking the position they could raise it, but you're not really taking a position on whether or not it was constitutional. I guess you are taking a position that it was perfectly constitutional, even though two states would have lower rates, right? Is that what the United States government is going to argue to the Supreme Court? Your Honor, we believe that this will hopefully be resolved in a court of appeals where the case was properly preceded, where the issues were raised, where they were briefed, where they were considered and decided by a trial court. No, but I'm just trying to find out what your position is. We believe that the 2017 amendment was constitutional. Even though it was uneven? There are many complex issues that are presented by this case. And unfortunately, I'm not authorized by the Department to address you for the first time. That's the real problem. Yes, that's the real problem, right? Let me get down to it. So there's a plain wording of the Constitution involved and you guys are ducking. No, Your Honor, we have many things to say. That's what you're doing, you're ducking. With respect, I believe this court's own practitioner's handbook says that oral argument is not the place to sort of go into dissection of various authorities. To paraphrase, it's not really to get into the nitty-gritty of legal analysis. I have your point and you don't want to talk about it? That's fine. I apologize, Your Honor. I will say this, that the statutory interpretation issue is still very much alive. They don't use the practitioner's handbook, it says. I apologize, Your Honor. The statutory interpretation issue is still very much alive, Your Honor. It would not be mooted by the constitutional arguments that they raise, even if they were to be resolved in Crangrove's favor. I think you've demeaned the court, to be very frank. I think you really have. I beg the court's pardon? I think the United States should be able to come in here and tell us what their position is. Our position is that it is constitutional and we are ready to submit in full a briefing as to why that is. Was that issue fully briefed in the Fifth Circuit? It's not before the Fifth Circuit yet, Your Honor. We've been authorized to seek direct review. The certification is currently pending. That's the procedural status now, so that's why your position is not of record in another circuit yet. That's correct, Your Honor. I see. Thank you. Our thanks to all counsel. The case is taken under advisement.